**UNITED STATES DISTRICT COURT**
**NORTHERN DISTRICT OF NEW YORK**

| | |
|---|---|
| M.C. and T.G., on behalf of themselves and all similarly situated individuals, <br><br> Plaintiffs, <br><br> v. <br><br> JEFFERSON COUNTY, NEW YORK; COLLEEN M. O'NEILL, as the Sheriff of Jefferson County, New York; BRIAN R. McDERMOTT, as the Undersheriff of Jefferson County; and MARK WILSON, as the Facility Administrator of Jefferson County Correctional Facility, <br><br> Defendants. | Case No.  6:22-cv-190 (DNH/ML) <br><br><br> **CLASS ACTION COMPLAINT** |

**PRELIMINARY STATEMENT**

1.      This civil rights class action challenges the Jefferson County Correctional Facility's ongoing practice of routinely denying prescribed, life-sustaining medical treatment to individuals in recovery from opioid addiction.

2.      For decades now, the opioid epidemic has devastated communities across this country. The loss of life has been staggering: more than half a million people dead in 20 years. Opioid addiction took the lives of 2,844 New Yorkers between June 2020 and June 2021—759 in the Northern District alone. That horror has worsened during the coronavirus pandemic. Today, one person in the United States dies of opioid overdose every seven minutes.

3.      Opioid addiction, or opioid use disorder ("OUD"), is a chronic brain disease that permanently rewires the brain for addiction, resulting in uncontrollable cravings for and use of

opioids, even if the consequences are dire. People with OUD frequently overdose and die from opioid use.

4.      The science is clear: The *only* effective treatment for this insidious disease is medication for opioid use disorder ("MOUD"), such as methadone and buprenorphine. Broad consensus in the medical community confirms agonist MOUD, such as methadone and buprenorphine, is the standard of care and necessary to treat opioid addiction. Other treatments— or no treatment at all—are perilous by comparison, as robust clinical data show.

5.      Trafficking in entrenched stigma around opioid addiction, Defendants—Jefferson County and county officials who operate and oversee the Jefferson County Correctional Facility—maintain a categorical ban on methadone and buprenorphine treatment for non-pregnant people at the jail, without regard to individual medical need. Acting under this MOUD ban, jail officials routinely strip individuals with OUD entering the jail of their prescribed medication, forcing them needlessly into life-threatening withdrawal.

6.      As a court in this District recognized just six months ago in *P.G. v. Jefferson County*,[1] the effects of sudden, forcible withdrawal from MOUD cannot be overstated. They are immediate.  They are excruciating. And they expose individuals with OUD in the County's custody to a substantial risk of death.

7.      Yet despite the Court's ruling in *P.G.* requiring Defendants to continue providing methadone treatment to one individual at the jail, in the months that have followed, jail officials have enforced their MOUD ban on others entering jail custody, stripping them of access to vital

---

[1]  Memorandum Decision and Order, *P.G. v. Jefferson Cnty.*, No. 21-cv-388-DNH-ML (N.D.N.Y. Sept. 7, 2021), ECF No. 47.

medical treatment for OUD, and triggering agonizing and dangerous withdrawal in the face of desperate requests for their medication.

8.      In the last month alone approximately a dozen individuals known to counsel, including Plaintiff T.G., have been denied access to prescribed agonist MOUD. Many continue to suffer crippling withdrawal symptoms and are now at heightened risk of relapse. And as the County continues undeterred in enforcing its MOUD ban against people with OUD, many more individuals cycling into the jail, including Plaintiff M.C., will pay the same steep price for the County's callous indifference.

9.      M.C. and T.G. seek to end this jail's cruel and discriminatory ban on agonist treatment for OUD once and for all. They seek declaratory and injunctive relief under the Constitution, the Americans with Disabilities Act ("ADA"), and the New York State Civil and Human Rights Laws on behalf of themselves and a class of similarly situated individuals, all of whom face life-threatening harm if Defendants' MOUD ban is not lifted.

## PARTIES

10.      Plaintiff M.C.[2] is a 29-year-old man who resides in Croghan, New York. He has a disability, opioid use disorder, for which he is prescribed daily treatment with agonist MOUD. M.C. faces imminent incarceration at the Jefferson County Correctional Facility.

11.      Plaintiff T.G. is a 31-year-old woman who resides in Watertown, New York. She has a disability, opioid use disorder, for which her treating physician in the community

---

[2] In light of the powerful stigma that people with OUD continue to face, *see* ¶¶ 85–90, *infra*, and the stringent federal laws mandating the confidentiality of OUD patients' information, Plaintiffs intend to seek the Court's leave to proceed under pseudonyms, and to pseudonymize the names of other current and former class members. pseudonymize the names of current and former members of the putative class whose names appear in court filings in this litigation.

prescribed daily treatment with agonist MOUD. T.G. is currently in pretrial detention at the Jefferson County Correctional Facility.

12.    Defendant Jefferson County, New York, is a municipal corporation organized under the laws of the State of New York. The Jefferson County Sheriff's Office is an agency of Jefferson County and operates the jail.

13.    Defendant Colleen M. O'Neill is the Sheriff of Jefferson County. As such, Defendant O'Neill is the legal custodian of all people confined to the jail and is responsible for the safe, secure, and humane treatment of these residents, including their medical care. She has policymaking authority with regard to the jail. At all relevant times, Defendant O'Neill was acting under color of state law. Defendant O'Neill is sued in her official capacity.

14.    Defendant Brian R. McDermott is the Undersheriff of Jefferson County. As such, he has control and supervision of all employees of the Jefferson County Sheriff's Office, including corrections officers and civilian employees, and has policymaking authority and oversight responsibilities with regard to the jail. He is also the direct supervisor of all Sheriff's Office administrative personnel, including the Facility Administrator of the jail. At all relevant times, Defendant McDermott was acting under color of state law. Defendant McDermott is sued in his official capacity.

15.    Defendant Mark Wilson is a Lieutenant in the Jefferson County Sheriff's Office and Facility Administrator of the jail. As Facility Administrator, he is charged with running and has policymaking authority over the day-to-day operations of the jail, including its provision of medical care. His duties include all administrative functions of jail operations, including but not limited to supervising corrections officers and other staff, as well as overseeing detained people's health, care, safety, and discipline. He is fully familiar with the jail's policies, practices,

procedures, and regulations. At all relevant times, Defendant Wilson was acting under color of

state law. Defendant Wilson is sued in his official capacity.

## FACTUAL ALLEGATIONS

**A.    Opioid Use Disorder Is a Life-Threatening Medical Condition and a Public Health Crisis.**

16.    Opioids are a class of drugs that inhibit pain and cause feelings of pleasure. Some

opioids, such as oxycodone, have accepted medical uses, including managing severe or chronic

pain. Others, such as heroin, are illegal and not used in medicine in the United States. All

opioids, including those prescribed for medical use, are highly addictive.

17.    OUD is a chronic brain disease. Symptoms of OUD include uncontrollable

cravings for and compulsive use of opioids, decreased sensitivity to opioids, and potentially

excruciating withdrawal symptoms. OUD is progressive, meaning it often becomes more severe

over time. Without effective treatment, patients with OUD are rarely able to control their use of

opioids, often resulting in serious physical harm or premature death, including due to accidental

overdose.

18.    OUD breaks down the dopamine system necessary for the brain to feel a sense of

normalcy and confidence in its own survival. People who are dopamine deficient have difficulty

enjoying life activities and feeling normal. Instead, they experience feelings of depression,

anxiety, and irritability. Brains that are addicted to opioids produce less than half the dopamine

of non-addicted brains.

19.    OUD permanently rewires the brain for addiction. People with OUD cannot

simply "will" or "reason" their way out of continued opioid use, even when they are aware of the

dire consequences. Continued opioid use does not indicate a person lacks willpower, but rather is

the predictable outcome of chemical changes in the brain that result in uncontrollable cravings.

20.     Opioid addiction has thus proven especially unresponsive to non-medication-based treatment methods, such as abstinence-only and twelve-step programs, which have been popular in treating other addictions such as alcoholism.

21.     Like other chronic diseases, OUD often involves cycles of relapse and remission. Rather than a linear progression in which a person attains abstinence from opioid use once-and-for-all, "successful" recovery for OUD is often characterized by sustained periods of abstinence or "active recovery," punctuated by relapses in which the person returns to drug use. These relapses are frequently triggered by a lapse in treatment, an increase in life stressors, or a traumatic event, which causes the person to turn toward illicit drug use. The typical treatment goal for OUD is thus to maximize periods of active recovery and minimize periods of relapse, by ensuring continued treatment and encouraging the use of coping mechanisms and support systems.

22.    OUD is an epidemic in the United States and a public health crisis. The incidence of OUD has skyrocketed since the late 1990s. Between 1999 and 2020, the number of annual opioid overdose deaths nationwide increased more than eightfold. Since 1999, more than 600,000 people in the United States have died from opioid overdose.



23.    The current COVID-19 pandemic, which has produced enormous grief, anxiety, and feelings of isolation, has further accelerated these trends. In the one-year period ending April 2021, the opioid epidemic claimed more than 75,673 lives in the United States—up almost 35% from the previous year. Today, one person dies of opioid overdose every seven minutes in this country.



24.    The opioid epidemic has not spared New York. In this state, the number of annual opioid overdose deaths increased almost sixfold between 2000 and 2020. The Centers for Disease Control and Prevention ("CDC") estimate that 2,432 New Yorkers died of opioid overdose in the 12-month period preceding June 2021.

25.    According to the New York State Department of Health ("DOH"), 759 people died of opioid overdose *in this judicial district alone* in the year-long period from June 2020 to June 2021.

26.    Since 2013, the proliferation of fentanyl and other synthetic opioids—an extremely dangerous class of drug—has been the primary driver of the sharp rise in opioid deaths. The CDC estimates that deaths from fentanyl and other synthetic opioids rose 36% from 2020 to 2021 alone. A lethal dose of fentanyl is a tiny fraction of a lethal dose of heroin, as demonstrated in the following figure.



27.    Heroin and other illegal opioids are now commonly laced with fentanyl, often without the knowledge of the person using the opioids. As a result, people with OUD who use illegal opioids now face a heightened risk of being unwittingly exposed to lethal doses of fentanyl.

**B.    Broad Scientific Consensus Confirms that MOUD Is Necessary to Treat OUD.**

28.    As the opioid epidemic takes an ever-greater toll in the United States, medical science has provided hope by demonstrating that overdose deaths are preventable with effective treatment.

29.     Broad consensus in the medical and scientific communities confirms that MOUD, also known as "medication for addiction treatment" or "MAT," are effective—and in fact necessary—to treat OUD. The American Medical Association, the American Society of Addiction Medicine, the U.S. Department of Health and Human Services, the U.S. Food and Drug Administration ("FDA"), the National Institute on Drug Abuse, the Office of National Drug Control Policy, and the Substance Abuse and Mental Health Services Administration ("SAMHSA") have all endorsed the necessity of MOUD. SAMHSA has explained, "[J]ust as it is inadvisable to deny people with diabetes the medication they need to help manage their illness, it is also not sound medical practice to deny people with OUD access to FDA-approved medications for their illness."

30.     New York State health agencies have similarly embraced the importance of MOUD. DOH, the Office of Mental Health ("OMH"), and the Office of Addiction Services and Supports all recognize MOUD as necessary to treat OUD. OMH has issued a letter to all state-licensed mental health clinics explaining that "MAT reduces overdose deaths, rates of [emergency department] visits and hospital stays, costs to payers and families, and improves quality of life with the potential for contribution to the community," and stating that clinics and hospitals "can contribute to mitigating the Opioid Epidemic" by "[o]ffering [MOUD] to all patients identified as having OUD."

31.     The two most recent presidential administrations have also embraced the importance of MOUD. Under President Biden, SAMHSA has identified MOUD as "life-saving, evidence-based treatment" that "Americans with [OUD] need and deserve." And in November 2017, President Trump's Commission on Combating Drug Addiction and the Opioid Crisis likewise acknowledged the efficacy of MOUD and the need to expand its availability to patients.

32.    Treatment with MOUD typically consists of medication combined with counseling and other behavioral therapies, with medication being the primary driver of efficacy. MOUD decreases opioid use, reduces the risk of relapse and overdose death, and improves treatment retention. Treatment retention is crucial for treating OUD because the longer a patient stays in treatment, the less likely they are to relapse. Studies have shown that MOUD also decreases the likelihood of criminal activity and infectious disease transmission, and improves patients' ability to maintain positive family relationships and employment.

33.    The FDA has approved three medications for treating OUD: methadone, buprenorphine, and naltrexone. Not all these medications are equally effective for every patient. Studies show that only two—methadone and buprenorphine—produce longer-term treatment retention, which is the key to effective MOUD treatment.

34.    Methadone and buprenorphine are "agonists," which means they activate opioid receptors in the brain to relieve withdrawal symptoms and control cravings. Methadone is a "full agonist," meaning that it fully activates opioid receptors, resulting in a stronger opioid effect. Buprenorphine[3] is a "partial agonist," meaning that it partially activates opioid receptors.

35.    The effect of both methadone and buprenorphine is much milder, steadier, and longer-lasting than drugs such as heroin, fentanyl, or oxycodone. Because methadone and buprenorphine bind to the opioid receptors they stimulate, they block the receptors from being stimulated by more powerful agonists—meaning that patients taking methadone and buprenorphine cannot get the same "high" from illicit drugs like heroin and fentanyl. This trains

---

[3] Buprenorphine is frequently administered in a medication combined with naloxone, including under the brand name Suboxone.

patients' brains to gradually decrease their response to and interest in opioids, in a process known as "extinction learning."

36.    Because they act on opioid receptors without presenting the same risk of overdose, both methadone and buprenorphine have been designated as "essential medicines" by the World Health Organization.

37.    Naltrexone is an "antagonist," which means it blocks opioid receptors without activating them, preventing the euphoric effect of opioids, and thus reducing desire for opioids over time. But naltrexone does not relieve withdrawal symptoms, and in fact can trigger acute and severe withdrawal. That withdrawal is especially severe when a patient has recently taken an opioid agonist such as methadone or buprenorphine. For that reason, medical standards require patients be fully withdrawn from opioids before receiving naltrexone—a process that requires not using opioids for anywhere from three to ten days.

38.    Studies have shown that naltrexone treatment produces substantially poorer outcomes in terms of treatment retention than either methadone or buprenorphine.

39.    Because methadone and buprenorphine are more effective than naltrexone at keeping patients in treatment for longer periods, methadone and buprenorphine are the standard of care for OUD, particularly among patients with severe OUD.

40.    While one form of MOUD may be more effective than others for particular patients depending on the patients' individual profiles—including the severity of the patient's OUD—there is no serious dispute within the medical community that agonist MOUD is the most effective treatment for OUD.

41.     As SAMHSA has recognized, treatment for OUD—like treatment for other chronic diseases such as insulin for diabetes—is often lengthy and can require years or be lifelong. There is no maximum recommended duration for treatment with an MOUD.

42.     Ending MOUD treatment prematurely is exceptionally dangerous. It triggers painful withdrawal symptoms that markedly increase the risk of relapse into opioid use, overdose, and death.

43.     The symptoms of withdrawal from MOUD are crushing. They include bone and joint aches, nausea, vomiting, diarrhea, fever, excessive sweating, hypothermia, hypertension, tachycardia, depression, anxiety, dysphoria, insomnia, and suicidal ideation. These symptoms can last for weeks or months, and can lead to life-threatening complications—even apart from the risk of relapse and overdose—including pneumonia and fatal dehydration.

44.     When treatment with MOUD must be discontinued, due to a patient's wishes or medical necessity, it is crucial to taper methadone and buprenorphine as slowly as possible to avoid severe withdrawal symptoms. That process of tapering often lasts several months, or even multiple years.

45.     Forcing a person with OUD to withdraw from effective MOUD treatment, absent significant side effects or contraindications, violates the standard of care. And doing so abruptly heightens the risk of acute withdrawal and is even more dangerous.

46.     Efforts to "medically manage" forced withdrawal or "detoxify" patients, with non-MOUD pain relievers or otherwise, are not meaningfully effective. Such efforts, also known as detoxification, do not improve long-term outcomes for people with OUD. To the contrary, as SAMHSA confirms, "[p]atients who complete medically supervised withdrawal are at a risk of opioid overdose."

47.      One study of treatment outcomes from a detoxification facility showed a 29% relapse rate on the day of discharge, a 60% relapse rate after one month, and a success rate of between only 5% and 10% after one year.

48.      It is particularly inappropriate and dangerous to forcibly change a patient successfully using agonist medication, such as methadone or buprenorphine, to an antagonist, such as naltrexone, because doing so subjects the patient to severe withdrawal. In addition, because naltrexone has worse outcomes in terms of treatment retention, that change would place the patient at increased risk of relapse, overdose, and death. Finally, there would be no guarantee that the new treatment regimen would be effective, whereas the patient has already demonstrated success on agonist medication.

**C.     Allowing Access to MOUD Is Particularly Important, and Is Feasible, In Carceral Settings.**

49.      Providing MOUD is especially critical in carceral settings, where people with OUD face a dramatically heightened risk of relapse, overdose, and death in the weeks immediately following release.

50.      A large proportion of incarcerated people have OUD. Approximately 80% of people in jails and prisons have a history of substance use, and 18.9% of sentenced people in local jails nationwide self-report that they regularly used opioids prior to incarceration.

51.      One study found that incarcerated people are 12,900% as likely to die of drug overdose in the two weeks immediately following release as compared to the general public.

52.      Access to MOUD plays a critical role in reducing death in incarcerated populations and yields positive results in the carceral setting.

53.     As the presidential Commission on Combating Drug Addiction and the Opioid Crisis concluded in 2017, treatment with MOUD is "correlated with reduced risk of mortality in the weeks following release" for people with OUD in jails and prisons.

54.     One large study of individuals with OUD who were released from prison found that, in the first month after their release, those receiving MOUD were 75% less likely to die of any cause and 85% less likely to die of drug poisoning. Another study found that incarcerated people receiving agonist MOUD treatment were 94% less likely to die during their first four weeks of incarceration than those not receiving that treatment.

55.     A study of the first year of the Rhode Island Department of Corrections' MOUD program found that 95% of individuals receiving MOUD continued treatment after their release. The program reduced post-release deaths by 60% and all opioid-related deaths in the state by more than 12%. In addition, because the program provided much needed treatment to people with OUD, the prevalence of illicit opioids in prison decreased.

56.     Withholding MOUD without a clinical reason to do so is always dangerous but is especially so for incarcerated individuals with OUD, who are especially likely to relapse and die upon release.

57.      Incarcerated individuals with OUD who are not provided with MOUD are nearly seven times as likely to die of drug poisoning in the first month after release than those who are given MOUD.

58.     As both the National Commission on Correctional Health Care and the National Sheriffs' Association have recognized, "correctional withdrawal . . . actually increases the chances the person will overdose following community release due to loss of opioid tolerance."

59.     The National Academy of Sciences, Engineering, and Medicine has observed that the "transition out of criminal justice settings is the time when users are most likely to overdose on opioids," and concluded that access to MOUD for incarcerated people is crucial to avoiding relapse, improving treatment retention, and lowering transmission of infectious diseases through illicit drug use.

60.     Even when it does not lead to immediate overdose upon release, withholding MOUD from incarcerated people has a broadly destabilizing effect on treatment, leading to a 700% decrease in the likelihood of continuing MOUD after release from jail or prison.

61.     Both the National Commission on Correctional Health Care and the National Sheriffs' Association have publicly recognized that "forced detoxification of prescribed opioid medication[] such as methadone can undermine an individual's willingness to engage in [MOUD] in the future, compromising the likelihood of long-term recovery."

62.     As one study of Bronx patients published in the Journal of Substance Abuse Treatment found, forcible removal from methadone during incarceration led to "severe withdrawal," which "contributed to a subsequent aversion to methadone and adversely affected future decisions regarding engagement in [MOUD treatment]."

63.     Given the serious risks that OUD poses for incarcerated people, it is no surprise that an array of governmental authorities and medical and professional associations require or recommend that jails and prisons provide maintenance MOUD to those in their custody.

64.     In recent years, the U.S. Department of Justice ("DOJ") has consistently taken the position that access to MOUD is required in both carceral settings and court programs. Repeatedly, DOJ has confirmed that MOUD is the standard of care for treatment of OUD and that denying access to MOUD can constitute unlawful disability discrimination.

65.     In 2017, the DOJ Civil Rights Division launched the Opioid Initiative to enforce the ADA and work with U.S. Attorney's Offices nationwide "to ensure that people who have completed, or are participating in, treatment for OUD do not face unnecessary and discriminatory barriers to recovery."

66.     That year, the U.S. Attorney for the Southern District of New York noted in a letter to the New York State Attorney General that MOUD "is a safe and widely accepted strategy for treating opioid disorders" with "broad support [] among medical and substance use experts." The letter instructed that "the Sullivan [County] family court and Sullivan surrogate's court should ensure that their policies and practices with respect to individuals participating in [MOUD] . . . are consistent with ADA requirements."

67.     DOJ's Adult Drug Court Discretionary Grant Program, a grant program that provides financial and technical assistance to state and local drug court initiatives, also requires grantees to permit the use of MOUD.

68.     In 2018, the U.S. Attorney for Massachusetts concluded "that all individuals in treatment for OUD, regardless of whether they are inmates or detainees, are already protected by the ADA, and [] the [Massachusetts Department of Correction] has existing obligations to accommodate this disability."

69.     In January 2021, the DOJ Civil Rights Division issued a report concluding that the Cumberland County Jail in Bridgeton, New Jersey, had violated the Eighth and Fourteenth Amendments to the U.S. Constitution by failing to provide MOUD to people in its custody. The report found that inadequate treatment of OUD presented a risk of serious harm and likely caused six of the jail's seven suicide deaths in the period studied. It also found that the jail had

been deliberately indifferent to that risk by failing to prescribe MOUD, despite knowing people in its custody had significant heroin usage or obvious symptoms of opioid withdrawal.

70.    In December 2021, the U.S. Attorney for Massachusetts reached a settlement with the Massachusetts Parole Board to resolve claims that the Parole Board had violated the ADA by failing to provide individuals on parole with their prescribed MOUD treatment. The settlement requires the Parole Board to ensure that parole applicants with OUD and no active MOUD prescription are assessed by a qualified addiction specialist, who may prescribe any of the three FDA-approved forms of MOUD deemed to be an appropriate treatment based on the assessment.

71.    The National Commission on Correctional Health Care and the National Sheriffs' Association have also come out strongly in favor of access to MOUD in jails and prisons, calling MOUD "a central component of the contemporary standard of care for the treatment of individuals with [OUD]," and concluding "all individuals with OUD should be considered for [MOUD]."

72.    The American Society of Addiction Medicine, the leading professional society in the country on addiction medicine, also recommends treatment with MOUD for people with OUD in the criminal justice system.

73.    And SAMHSA identifies making treatment available to detained and incarcerated people as one of the remaining challenges in fighting the opioid crisis.

74.    Ensuring the robust access to the MOUD treatment that these agencies and organizations support is both feasible in and beneficial to carceral settings.

75.    In recommending expanded access in jails and prisons to MOUD, including methadone, both the National Commission on Correctional Health Care and the National Sheriffs' Association have emphasized that such access can "[c]ontribut[e] to the maintenance of

a safe and secure facility for inmates and staff"; and reduce recidivism, withdrawal symptoms, the risk of post-release overdose and death, and disciplinary problems.

76.     That recommendation is borne out by the experience of correctional administrators at facilities nationwide, including here in this judicial district.

77.     After implementing a comprehensive MOUD program at the Albany County Correctional Facility in 2019—including access to agonist treatment for OUD with methadone and buprenorphine—Sheriff Craig Apple said of the program, "In the first three months, we saw a reduction in diversion and recidivism. And it was saving lives. It's a no-brainer."

78.     Providing comprehensive access to treatment for MOUD with agonist therapy is strikingly inexpensive, even in facilities like the Albany jail, which have significantly greater populations than the Jefferson County Correctional Facility. According to Sheriff Apple, the total cost of providing MOUD to the first 110 program participants at Albany County Correctional Facility was about $30,000—far cheaper than other medical care that jails routinely provide, such as cancer treatment and kidney dialysis.

79.     In addition to Albany County Correctional Facility, numerous local jails around New York State provide access to agonist medication to treat people OUD.

80.     Rikers Island has had an on-site opioid treatment program since 1987 where participants can receive methadone or buprenorphine while incarcerated, as well as connections to care upon release from jail and return to the community.

81.     Niagara County Jail provides methadone and buprenorphine to people who were receiving MOUD prior to their incarceration.

82.     Saratoga County Jail has created a dedicated 31-cell pod for veterans with OUD, where they can receive methadone or buprenorphine.

83.     Jails and prisons throughout the country also allow incarcerated individuals to continue with MOUD treatment during incarceration. Examples include Bernalillo County Metropolitan Detention Center (New Mexico); Kings County Jail (Washington State); and Orange County Jail (Florida). The Rhode Island, Maine, and Vermont Departments of Corrections make MOUD available to all incarcerated people with OUD throughout their entire sentence, even those who were not receiving MOUD before being incarcerated. And in November 2019, the federal Bureau of Prisons issued guidance requiring that all its facilities provide continuing MOUD to people in their custody if it is clinically appropriate.

84.     Indeed, Defendants' own practice of providing methadone to pregnant people with OUD at the Jefferson County Correctional Facility demonstrates the feasibility of ensuring access to such treatment for non-pregnant people.

**D.    Pervasive Stigma Towards People with OUD Functions as a Barrier to Effective Treatment.**

85.     Despite broad consensus among scientific experts and governmental authority that MOUD is efficacious and necessary, entrenched stigma towards OUD generally and MOUD specifically continues to obstruct access to these life-saving medications.

86.     This stigma is grounded in longstanding and deeply rooted misconceptions that OUD is a choice and a moral failing. A nationwide poll found that 78% of Americans believed people who are addicted to prescription opioids are themselves to blame, and that 72% believed people addicted to prescription opioids lack self-discipline. News coverage of the opioid epidemic has often "reinforce[d] the widely-held notion . . . that addiction is the result of poor individual choices." These misconceptions persist even though OUD is a medical condition that permanently rewires the brain and renders it chemically dependent on opioids—a condition that millions of Americans of all backgrounds live with. As National Institute on Drug Abuse

Director Dr. Nora D. Volkow writes, stigma "is especially powerful in the context of substance use disorders. Even though medicine long ago reached the consensus that addiction is a complex brain disorder, those with addiction continue to be blamed for their condition."

87.    Research confirms that stigma towards OUD is a formidable barrier to patients' accessing necessary treatment. As explained in an article published in the scientific journal Substance Abuse and Misuse, some continue inaccurately to regard MOUD as merely "substituting one drug for another"—equating the professional administration of an essential medicine with the use of illicit drugs. Another article published in the International Journal of Mental Health and Addiction notes that numerous public health studies have concluded that this stigma "is a major driver behind the lack of access to opioid agonist therapy," as well as a barrier to treatment retention and success.

88.    These barriers are especially present in the criminal justice system, where the false belief that the use of agonists or partial agonists just substitutes one addiction for another is prevalent and often causes jail and prison administrators to refuse to provide access to methadone and buprenorphine. As a group of experts representing medical institutions across the country recently lamented, the "undertreatment of people with OUDs who . . . have a history of involvement with the criminal justice system, often motivated by stigma, represents a missed public health opportunity given the well-established effectiveness of opioid agonist treatment."

89.    People of color are particularly impacted by the barriers to MOUD access in jails and prisons because they face discrimination at each stage of the criminal legal system. For example, Black people are incarcerated for drug violations at nearly six times the rate of white people, despite comparable rates of drug use. And significant racial disparities in access to MOUD extend beyond the carceral system. For that reason, the denial of MOUD access in jails

and prisons disproportionately harms people of color—and the removal of barriers to MOUD access in carceral settings would particularly benefit treatment outcomes for people of color.

90.     Because "stigma is a barrier to implementation of evidence-based policies and program to address the opioid crisis," medical and governmental authorities have identified combatting stigma as key to improving health outcomes for people with opioid addiction and, ultimately, to ending the opioid epidemic. Both the Department of Health and Human Services and the American Medical Association's Opioid Task Force have identified countering stigma as integral to addressing the opioid crisis. The National Institutes of Health has funded clinical interventions seeking to reduce the effect of stigma on care delivery to people with OUD. And former FDA Commissioner Dr. Scott Gottlieb underscored that the urgent work of "expand[ing] access to high-quality, effective medication-assisted treatments" to patients with OUD must include "countering the unfortunate stigma that's sometimes associated with their use."

**E.     The Jail Maintains a Routine Practice of Denying Prescribed Agonist MOUD, Without Regard to Medical Necessity**

91.     For years, Defendants have maintained a blanket policy or practice of denying agonist MOUD to people in the Jefferson County Correctional Facility's custody unless they are pregnant.

92.     The ban is categorical, applying to every non-pregnant person, in every situation, irrespective of individual medical need.

93.     When non-pregnant people ask the jail's medical staff for methadone or buprenorphine treatment for OUD, the medical staff routinely deny those requests pursuant to the blanket ban and state that the jail does not provide or allow access to such treatment.

94.    Even when methadone or buprenorphine has been prescribed by a physician as medically necessary, Defendants' blanket MOUD ban not only permits, but in fact requires, jail medical staff to refuse those treatments, no matter the consequences.

95.    When non-pregnant people facing detention at the jail have submitted requests to the jail for continuation of their prescribed MOUD treatment as an accommodation for their OUD disability, the jail has, pursuant to the blanket ban, refused to grant the requests.

96.    For any person with OUD at the jail, the consequences of the jail's MOUD ban are substantial. The ban deprives individuals with OUD of access to life-saving addiction treatment at precisely the moment of utmost need: Studies have shown that incarcerated people receiving treatment with agonist MOUD were 94% less likely to die during their first four weeks of incarceration, and 85% less likely to die of drug poisoning in the first month following their release, than those not receiving that treatment.

97.    For the many individuals already prescribed agonist MOUD when they enter the jail, the consequences of Defendants' MOUD ban are especially severe: abrupt and forcible cessation of their prescribed treatment, triggering painful and dangerous withdrawal within a matter of hours.

98.    At least six people currently in the jail's custody have been removed from their prescribed treatment with agonist MOUD. At least an additional three people released from the jail within the last month were denied their prescribed agonist MOUD treatment during their detention. This indicates that Defendants' ban is applied on a routine basis—at least several times each month—to people with active MOUD prescriptions when they enter the jail. And dozens, if not hundreds, of such people are deprived of their desperately needed medication at the jail over the course of a year.

99.    Defendants are fully capable of making agonist MOUD available to individuals at the jail and have various options for doing so. Indeed, Defendants already provide methadone treatment as a matter of course to pregnant people with OUD in their custody. And pursuant to the Court's preliminary injunction order in *P.G. v. Jefferson County*,[4] Defendants have also been providing the plaintiff, P.G., with continued access to his daily methadone treatment.

100.    But Defendants have not provided access to methadone or buprenorphine treatment to any non-pregnant persons in the jail's custody other than P.G.

101.    Defendants have admitted that prior to the issuance of the preliminary injunction in *P.G.*, no non-pregnant person had ever received methadone treatment while at the jail.

102.    The jail's own policy documents reveal that Defendants' ban on agonist MOUD is not a product of ignorance. Quite the contrary, Defendants are aware of the importance of agonist MOUD yet are unwilling to make it available to non-pregnant people with OUD at the jail.

103.    The jail has a written policy of providing non-pregnant people with OUD with access to naltrexone treatment during the week prior to their release. The patient questionnaire for this naltrexone program asks whether the patient has ever been prescribed methadone or buprenorphine, and "If Yes, was it helpful?" The jail is thus aware that methadone and buprenorphine are prescribed as treatment for people with OUD, and that such treatment may be beneficial.

104.    The jail also has a policy requiring jail staff to maintain doses of Narcan nasal spray for the emergency treatment of people experiencing an opioid overdose. This policy

---

[4] Memorandum Decision and Order, *P.G. v. Jefferson Cnty.*, No. 21-cv-388-DNH-ML (N.D.N.Y. Sept. 7, 2021), ECF No. 47.

reflects Defendants' understanding that people in the jail's custody may access opioids and overdose during their incarceration.

105.    The jail's written policies are issued by the Facility Administrator and require the signature and approval of the Sheriff and Undersheriff.

106.    On information and belief, the jail requires approval of the Facility Administrator, Sheriff, and Undersheriff for the jail or any of its agents to provide people in its custody with a controlled substance that would otherwise be deemed contraband, such as methadone or buprenorphine for OUD.

**F.    The Jail Subjects Scores, If Not Hundreds, of People to Its MOUD Ban Each Year.**

107.    As of this filing, there are at least six people currently in the jail's custody who have been denied access to their prescribed agonist MOUD treatment pursuant to Defendants' MOUD ban. Without their medication, these individuals are in the throes of withdrawal they have described as "unbearable" and so agonizing "it is impossible to describe." And Plaintiff M.C., who will imminently be incarcerated at the jail, fears that he too will be stripped of his agonist MOUD and forced to undergo withdrawal.

*M.C.*

108.    M.C. is diagnosed with severe OUD, for which he is prescribed daily treatment with an agonist MOUD, methadone. M.C. has been battling opioid addiction since he was a teenager. His drug use began after he was in a four-wheeler accident when he was in his mid-teens. He was prescribed Percocet for his injuries and became dependent on it. By the time he was 19 years old, he was injecting heroin intravenously.

109.    M.C. almost lost his life to opioids on several occasions. He once overdosed and had to be revived with Narcan. Another time, he lost consciousness for ten minutes after overdosing and only came to thanks to his brother's efforts to resuscitate him.

110.    M.C. is not the only person in his family who has been in the grips of opioid addiction. His father—M.C.'s closest friend—died a few years ago from overdose. And M.C.'s oldest brother battled heroin use for years before getting on methadone treatment and turning his life around.

111.    Like so many other people living with OUD, M.C. has tried again and again to overcome his addiction. For years, he cycled in and out of different rehabilitation programs—more than ten in all. But without medication to support his recovery efforts, he could not stop himself from relapsing.

112.    Following his unsuccessful attempts to manage his OUD without medication, M.C. began treatment with Suboxone pursuant to a prescription in or around 2015. Although the Suboxone was more effective for him than detoxification without medication, it still did not adequately control his opioid cravings. He persisted with the treatment for approximately a year and half, but he wasn't able to fully stop using opioids during that time.

113.    In or around May 2017, M.C.'s treating team at Credo transitioned him to methadone. In contrast to Suboxone, methadone allowed M.C. to sustain active recovery from OUD. The daily methadone therapy enabled him to manage his opioid cravings and substantially mitigated the other symptoms of OUD that had previously plagued him. With the newfound stability in his life, he was able to start working as a landscaper and spent more time with his three children.

114.    During two periods of incarceration in 2019, however, M.C.'s methadone treatment was involuntary terminated. On both occasions, he was suffered excruciating withdrawal symptoms: he has experienced extreme body aches, insomnia, and terrifying

hallucinations about people coming into his cell to hurt him. M.C. recalls that these periods were the sickest he had ever been in his life; he is "petrified to have to go through that again."

115.    These forced withdrawals from MOUD also threatened to derail M.C.'s hard-fought recovery. Because his opioid cravings returned without his medication, M.C. relapsed following each release.

116.    For the past two years, however, M.C. has been able to receive consistent treatment with methadone at Credo. On his therapeutic dosage of 185 mg per day, he has been able to stop using drugs and is making significant progress in rebuilding his life. He now lives with his girlfriend in their own apartment in Croghan and takes great joy in taking his three sons hiking, swimming, and bowling.

117.    But M.C. fears that his recovery will again be derailed when he is taken into the custody of the Jefferson County Jail and forcibly removed from his methadone treatment. He is scheduled to be sentenced and committed to the jail on March 2, 2022, pursuant to a plea deal.

118.    On February 24, 2022, M.C. through counsel sent a letter requesting that Defendants accommodate his disability by affording him continued access to his prescribed methadone while he is in the jail's custody. The request included a letter from M.C.'s treating physician at Credo explaining that methadone is "medically necessary treatment" for M.C.'s OUD, and that discontinuing that treatment would trigger "severe and extended withdrawal" as well as "put him at greater risk of dangerous overdose."

119.    Defendants did not grant the request.

***T.G.***

120.    T.G., a 31-year-old Watertown resident, has been detained at the Jefferson County Jail since January 20, 2022. She is diagnosed with OUD, for which she has been prescribed

27

methadone treatment. Defendants have refused to allow her access to that treatment at any point during her detention.

121.    T.G.'s addiction began when she was 23 years old, in the wake of a devastating personal tragedy. Her young daughter died, causing T.G. to fall into depression and exacerbating her other mental health illnesses. She turned to heroin in an attempt to escape her pain and stress.

122.    Prior to beginning methadone treatment, T.G. made numerous attempts to overcome her OUD, including inpatient rehabilitation programs and therapy. But without medication to manage her opioid cravings and withdrawal, none of these programs worked.

123.    T.G. was prescribed and began methadone treatment at Credo in 2016. Methadone finally empowered her to stop using drugs and to rebuild her life. She was able to go back to nursing school, maintain employment, and return to being an active presence in the lives of her children. For more than a year and a half preceding her current detention, T.G. received consistent methadone therapy and eventually settled on a therapeutic dosage of 20 mg per day.

124.    When T.G. was taken into the jail's custody, however, Defendants removed her from her treatment. Even though she repeatedly informed jail staff that she has a methadone prescription and pleaded to be given access to her medication, the staff told her that the jail does not provide methadone. In particular, a nurse told T.G. that it would be pointless for her to request methadone because the jail does not allow it, and that the only person at the jail who has access to methadone—P.G.—got it only because he had a good attorney.

125.    The involuntary termination of her treatment has caused T.G. to suffer excruciating withdrawal. She has experienced severe pain as well as continual nausea, vomiting, and defecation. She has no appetite and struggles to eat. She also feels terrible anxiety and

restlessness. And she is constantly assaulted by drug cravings. She continues to suffer from withdrawal symptoms today.

### J.C.

126.    J.C., a 33-year-old Evans Mills resident, has been detained at the Jefferson County Jail since October 22, 2021. He is diagnosed with OUD, for which he has been prescribed treatment with methadone. Defendants have stripped him of his MOUD treatment for the entirety of his time in their custody.

127.    J.C. became ensnared in opioid addiction a decade ago following a serious accident. In 2012, he was working as a painter in the Washington, D.C. area when he was hit by a car on the job. The collision broke his back in multiple places and lacerated his liver. He needed four or five surgeries for his injuries, and was prescribed opioid painkillers to manage the pain. Within months, he became dependent on the painkillers. When his prescription ended, he was driven by his cravings to begin using heroin.

128.    OUD quickly derailed J.C.'s life. During one particularly difficult period, he overdosed several times in a matter of months, and had to be resuscitated with Narcan more than once.

129.    Before his experience with MOUD treatment, J.C. did everything he could to overcome his addiction. He tried quitting cold turkey, committing himself to inpatient rehabilitation programs, and attending therapy and counseling. But none of these programs worked beyond the short term. Without any medication, the cravings and anxiety J.C. felt were overwhelming, and he always ended up using drugs again.

130.    J.C. began receiving MOUD treatment in around 2017 or 2018, when he was prescribed methadone at Credo. In contrast to the previous programs that he had tried,

methadone treatment allowed him to regain control over his addiction because it reduced his opioid cravings. Although his treatment has been interrupted at several points by periods of incarceration, J.C. was receiving steady methadone treatment at the time he was taken into the jail's custody in October 2021. He had a prescription for methadone and was on a therapeutic dosage of 85mg per day.

131.    But Defendants have denied J.C. access to his prescribed methadone throughout his current detention. When he told the nurse who conducted his medical screening about his prescription, she did not even acknowledge what he said. After being ignored by the nurse, J.C. also asked several officers during his first two weeks at the jail about his methadone medication. Those requests were also ignored.

132.    When J.C. learned that one person at the jail—P.G.—was being allowed to get MOUD treatment, he asked an officer about it. The officer told him: "Forget about it. That's a one-off thing."

133.    Without his medication, J.C. has undergone excruciating withdrawal—so painful it is "impossible to describe." He has had hallucinations, leg spasms, and cold sweats. He threw up and defecated all over himself and could not eat or sleep. J.C. describes the methadone withdrawal as far worse than any heroin withdrawal he has experienced—worse even than waking up with a broken back and internal organ damage after he was hit by a car.

134.    Even now, more than four months into his detention, J.C. is still feeling the effects of withdrawal. And without his MOUD, he is consumed by cravings and feels constantly manic because he cannot stop thinking about using drugs.

***M.S.C.***

135.    M.S.C., a fifty-three-year-old Watertown resident, was detained at the Jefferson County Jail from January 7 to February 14, 2022. For the entirety of those five weeks, the jail denied him access to his prescribed MOUD, methadone.

136.    M.S.C.'s first exposure to opioids came when he was just a child. His mother was a nurse who had access to opioid pain medications, and would use those medications to treat M.S.C. for relatively minor ailments. For example, when he sprained his ankle, his mother gave him Vicodin. After experiencing the euphoric feeling of opioids a few times, he could not shake that sensation from his mind.

137.    M.S.C. used opioid painkillers through his 20s and 30s, but was able to maintain a career in construction. Then, in 2005, he fell 20 feet from a ladder in a work accident and broke his back in two places. He was prescribed opioids to manage the pain and his opioid use escalated in the next few years. He began using heroin in 2010.

138.    M.S.C.'s opioid use almost killed him. Several times, he overdosed and had to be revived with Narcan.

139.    Realizing how dangerous his opioid use had become, M.S.C. began treatment with OUD in 2014. He was prescribed Suboxone and found that it was generally effective at managing his opioid cravings.

140.    In early 2021, M.S.C. switched from Suboxone to methadone treatment for his OUD. His doctors recommended the change because he was scheduled for a surgery for which he needed other pain medication, and Suboxone would have interacted adversely with that medication.

141.    M.S.C. was beginning to achieve stability with his methadone treatment when he was detained for approximately two months at the Jefferson County Jail in mid-2021. The jail

refused to provide M.S.C. with his prescribed methadone medication, even though he repeatedly requested it and expressed his pressing need for it. As a result, he suffered weeks of extremely painful withdrawal symptoms.

142.    M.S.C. resumed methadone treatment at Credo in October 2021.

143.    In December 2021, when M.S.C. learned that he would again be detained at the Jefferson County Jail, his counsel sent a letter requesting that Defendants accommodate M.S.C.'s disability by affording him continued access to his prescribed methadone while he was in the jail's custody.

144.    Defendants did not grant M.S.C.'s accommodation request. Instead, they informed M.S.C. that the jail would not address his request until he was in the jail's custody.

145.    But when Defendants took M.S.C. into the jail's custody on January 7, 2022, they did not address his request. Even though M.S.C. asked again at intake for continuation of his methadone therapy, the jail removed him from his medication.

146.    Every day for at least five days following his admission to the jail, M.S.C. repeatedly asked jail staff for his methadone medication. Several correction officers and a nurse told him he would not get any methadone because the jail does not allow it.

147.    Without his treatment, M.S.C. went through excruciating withdrawal. He suffered heart palpitations, acute pain in his neck and upper body, muscle spasms throughout his body, anxiety, and insomnia. He had terrifying hallucinations. His withdrawal symptoms persisted throughout the five weeks he was held at the jail. M.S.C. states that the "agony" of being forcibly removed from methadone is "impossible to describe to people who have not experienced it."

*R.G.*

148.    R.G.., a fifty-one-year old Watertown resident, was incarcerated at the Jefferson County Jail from December 21, 2021, to February 3, 2022. Defendants refused to allow him access to his prescribed MOUD, Suboxone, during the six weeks he was at the jail

149.    R.G. has had OUD for more than three decades. His dependence on opioids began when he was prescribed an opioid painkiller for a root canal operation in 1989. He became addicted to heroin shortly thereafter.

150.    R.G. first received treatment with MOUD in 2013, when he was prescribed Suboxone. When he has been receiving a therapeutic dosage of Suboxone, the medication has been effective at managing his addiction.

151.    The stability Suboxone treatment has afforded R.G. has allowed him to complete almost four semesters of an associate's degree in chemical dependency at the Jefferson Community College. He is motivated to complete this degree so that he can help support others who are battling addiction like he is.

152.    Before his most recent incarceration at the Jefferson County Jail, R.G. had already been removed from his prescribed Suboxone twice pursuant to the jail's MOUD ban. He was detained at the jail in around 2015 and early 2020, for approximately two to three months on each occasion. Each time, the jail refused to allow him to continue his Suboxone treatment, even though jail staff knew that he had been actively receiving that treatment prior to his detention.

153.    The withdrawal R.G. underwent each time the jail cut off his treatment was excruciating. He experienced bone aches, sleeplessness, and anxiety. He felt his skin crawl and was not able to eat or drink. He also suffered severe stomach cramps that caused him to constantly vomit, urinate, and defecate on himself. The withdrawals persisted for six to eight weeks.

154.    Terrified that he would again be deprived of his treatment, R.G. pleaded repeatedly with staff at the Jefferson County Jail for continued access to his prescribed Suboxone when he arrived in December 2021. His pleas were to no avail. Nurse LuAnne Beutel told him, "You're not going to get that here" because the jail does not provide Suboxone. One sergeant told R.G. his requests were pointless because the jail would not give him Suboxone. And several officers told him, "I don't know why you're doing this," because the jail was not going to provide his medication.

155.    As a result, R.G. suffered withdrawal symptoms similar to those he suffered the previous two times Defendants had discontinued his Suboxone therapy, including insomnia, chills, nausea, bone aches, and mood swings.

***S.G.***

156.    S.G., a 29-year-old resident of Gouverneur, was recently detained at the Jefferson County Jail from November 29, 2021, to February 18, 2022. S.G. was denied access to his prescribed MOUD, Suboxone, for the duration of his detention.

157.    S.G. has suffered from addiction since he was a child. When he was only 12 years old, S.G. was sexually assaulted. Around this time, he was also diagnosed with severe mental health problems. S.G. began using substances to escape his trauma and instability, ultimately turning to heroin, to which he quickly became addicted.

158.    Although he made numerous attempts to abstain from drug use, including attending rehabilitation programs and detoxing on his own, S.G. was not able to remain sober. Without medication to curb his drug cravings, he always relapsed.

159.    Desperate to find a treatment that would help him successfully manage his addiction, S.G. began MOUD under the supervision of a doctor and was prescribed Suboxone.

160.    Suboxone significantly improved S.G.'s OUD. The medication alleviated his drug cravings and eased his anxiety. He was able to remain sober and was motivated to better himself, enrolling in an online college to further his education and gain professional skills.

161.    But the stability Suboxone afforded him lulled S.G. into a false sense of security. Unaware of the importance of maintaining long-term MOUD treatment, S.G. decided to wean himself off Suboxone. As a result, his addiction became unmanageable, and he relapsed. The relapse completely destabilized S.G.'s life, leading to his arrest in August 2020.

162.    After S.G. was released on bail in June 2021, he restarted his MOUD treatment by attending an inpatient rehabilitation program at Van Dyke Treatment Center, where he was prescribed Suboxone. Upon completion, S.G. transitioned to outpatient MOUD treatment at Gouverneur Hospital - St Lawrence County.

163.    Like before, Suboxone successfully treated S.G.'s OUD. On Suboxone, S.G.'s drug cravings subsided, and his mental health improved. He became self-reliant and was eager to improve himself, obtaining a steady job in construction.

164.    In the summer of 2021, S.G. pled guilty to charges stemming from his August 2020 arrest, and he began serving his sentence at the Jefferson County Correctional Facility on November 29, 2021.

165.    Despite S.G.'s prescription for Suboxone, the jail deprived him of his medication. The booking staff did not inquire into whether S.G. received MOUD and recorded his prescription only at S.G.'s insistence. When S.G. requested Suboxone from the medical staff, he was mocked and informed that he would have suffer through withdrawal. And when S.G. requested Suboxone through the jail's kiosk system, the medical staff did not even meet with

him. Instead, they only sent him ibuprofen, which did not relieve his symptoms of withdrawal whatsoever.

166.    Without access to Suboxone, S.G. experienced torturous withdrawal symptoms. Throughout his time at the jail, S.G. frequently hallucinated and had traumatic nightmares. His stomach was constantly upset, and he regularly vomited and had diarrhea. He had cold sweats, struggled to sleep, and lost his appetite. His mental health deteriorated as a result and his drug cravings remerged in full force, undermining his resolve to remain sober.

## CLASS ALLEGATIONS

167.    This case is brought as a class action pursuant to Rules 23(a) and 23(b)(2) of the Federal Rules of Civil Procedure on behalf of all non-pregnant individuals who are or will be detained at the Jefferson County Correctional Facility and had or will have prescriptions for agonist MOUD at the time of entry into Defendants' custody. The class also encompasses two subclasses: one of class members subject to pre-trial detention and one of class members subject to post-conviction detention.

168.    The proposed class and subclasses are sufficiently numerous that joinder of all members is impracticable. Within the last month alone, approximately a dozen non-pregnant individuals at the jail known to Plaintiffs' counsel have been denied access to prescribed agonist MOUD. That suggests scores, if not hundreds, of putative class members are subjected to Defendants' MOUD ban every year. And many more such individuals are likely to enter Defendants' custody in the future.

169.    Common questions of law and fact affect the class members, including, without limitation:

a. Whether Defendants maintain any policy or practice of denying prescribed agonist MOUD to non-pregnant individuals detained at the Jefferson County Correctional Facility;

b. Whether OUD is an objectively serious medical condition;

c. Whether involuntary cessation of prescribed agonist MOUD exposes class members to a substantial risk of serious harm;

d. Whether Defendants are deliberately indifferent to the substantial risk of serious harm to which involuntarily ceasing prescribed agonist MOUD exposes class members;

e. Whether Defendants deny class members meaningful access to the jail's medical services on account of class members' OUD by maintaining a policy or practice of denying prescribed agonist MOUD; and

f. Whether Defendants' policy or practice of denying prescribed agonist MOUD discriminates on the basis of disability.

170. Plaintiffs' claims are typical of those of the class. The Named Plaintiffs challenge a policy or practice that applies to all class members and on grounds that apply to all class members.

171. Plaintiffs will fairly and adequately protect the interests of the class. Their interests this action align closely with those of other class members; and their counsel have extensive experience litigating similar matters on a class-wide basis.

172. Defendants' MOUD ban applies generally to the class, so that final injunctive relief and corresponding declaratory relief is appropriate respecting the entire class.

## JURISDICTION AND VENUE

173.    This Court has subject-matter jurisdiction over this action pursuant to 28 U.S.C. §§ 1331, 1343, and 1367; 42 U.S.C. § 1983; and Title II of the Americans with Disabilities Act, 42 U.S.C. § 12131 *et seq.*

174.    This Court has jurisdiction to issue declaratory relief pursuant to 28 U.S.C. §§ 2201 and 2202 and 42 U.S.C. § 12133; and injunctive relief pursuant to 42 U.S.C. § 12133 and Rule 65 of the Federal Rules of Civil Procedure.

175.    Venue lies in this judicial district pursuant to 28 U.S.C. §§ 1391(b)(1), (b)(2).

## CLAIMS FOR RELIEF

### First Claim
### Violation of Title II of the Americans with Disabilities Act
### (for all class members)

176.    Defendants' conduct as alleged in the Complaint violates Title II of the Americans with Disabilities Act.

### Second Claim
### Violation of the Eighth Amendment to the United States Constitution
### (for members of the post-conviction subclass)

177.    Defendants' conduct as alleged in the Complaint violates the Eighth Amendment to the United States Constitution.

**Third Claim**
**Violation of the Fourteenth Amendment to the United States Constitution**
**(for members of the pre-trial subclass)**

178.    Defendants' conduct as alleged in the Complaint violates the Fourteenth

Amendment to the United States Constitution.

**Fourth Claim**
**Violation of New York State Civil Rights Law**
**(for all class members)**

179.    Defendants' conduct as alleged in the Complaint violates Section 40-c of the New

York State Civil Rights Law.

180.    The Named Plaintiffs have complied with the requirements of New York State

Civil Rights Law § 40-d by serving notice of their Section 40-c claim on the New York State

Attorney General.

**Fifth Claim**
**Violation of New York State Human Rights Law**
**(for all class members)**

181.    Defendants' conduct as alleged in the Complaint violates Section 296 of the New

York State Human Rights Law.

**REQUEST FOR RELIEF**

WHEREFORE, Plaintiffs request that the Court:

    a.    Assume jurisdiction over this action;

    b.    Certify this action as a class action on behalf of the putative class and

        subclasses, and appoint the undersigned as class counsel;

    c.    Declare that Defendants' conduct as alleged in the Complaint violates the

        rights of Plaintiffs and the putative class under the Constitution, Title II of the

ADA, Section 40-c of the New York State Civil Rights Law, and Section 296 of the New York State Human Rights Law;

d.  Enjoin Defendants from:

    i.  Enforcing their agonist MOUD ban against Plaintiffs and the putative class;

    ii.  Interrupting Plaintiffs or class members' treatment with prescribed agonist medication for OUD while they are detained in Defendants' custody;

e.  Enjoin Defendants to ensure Plaintiffs and the putative class continued access to their prescribed agonist MOUD treatment during their detention, including by creating a discharge plan to ensure continuity of treatment upon their release;

f.  Award Plaintiffs reasonable attorney's fees and costs; and

g.  Grant any further relief that the Court may deem just and proper.

Dated: March 1, 2022
      New York, New York

                         Respectfully submitted,

                         NEW YORK CIVIL LIBERTIES UNION
                           FOUNDATION

                         */s/ Antony P.F. Gemmell*
                         Antony P.F. Gemmell, #700911
                         Terry T. Ding, #702578
                         Molly K. Biklen, #515729
                         Gabriella M. Larios[*]
                         Claire E. Molholm[†]

---

[*] Application for admission to the Northern District of New York forthcoming
[†] Law graduate pending admission, practicing under supervision.

125 Broad Street, 19th Floor
New York, New York 10004
Telephone: 212-607-3300
Facsimile: 212-607-3318
agemmell@nyclu.org

*Counsel for Plaintiffs*